**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PETER R.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 2844** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Peter R. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for SSI on May 23, 2017, alleging that he has been disabled since November 27, 2013 due to osteoarthritis, severe joint pain, cardiomyopathy, hyperlipidemia, tachycardia, high blood pressure, panic attacks, diabetes, peripheral neuropathy in both hands, and chest pains. (R. 236, 259). Born in 1959, Plaintiff was 54

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

years old as of the alleged disability onset date, making him a person closely approaching advanced age (age 50-54), and he has since switched categories to a person of advanced age (age 55 or older). (R. 236); 20 C.F.R. § 416.963(d), (e). He completed high school and lives with a roommate. (R. 110, 260). Plaintiff spent 20 years as a warehouse worker for different companies between January 1980 and February 2000, then held a job as a bartender from February 2000 to February 2005. (R. 261). In March 2008, Plaintiff got a seasonal job as a sandwich maker/bartender at a golf course, working March to November. (R. 98-99, 246). There is some confusion in the record as to when he quit the position due to his conditions (November 2010 or November 2013), but it is undisputed that he has not engaged in any substantial gainful activity since the alleged disability onset date. (R. 96, 247, 261).

The Social Security Administration denied Plaintiff's application initially on August 24, 2017, and again upon reconsideration on January 9, 2018. (R. 129-52). Plaintiff filed a timely request for a hearing and appeared before administrative law judge James D. Wascher (the "ALJ") on January 17, 2019. (R. 89). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Richard Fisher (the "VE"). (R. 91-128). On March 13, 2019, the ALJ found that Plaintiff's degenerative disc disease of the cervical spine, neural irritation of the lumbar spine, bilateral hand osteoarthritis, left carpal tunnel syndrome, syndesmotic injury of the left ankle status post open reduction internal fixation surgery, congestive heart failure, and paroxysmal atrial fibrillation are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 76-78). After reviewing the evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC")

to perform light work involving: occasional climbing of ladders, ropes, and scaffolds; frequent climbing of stairs and ramps; frequent kneeling, crouching, and crawling; and frequent handling bilaterally, meaning 34-66% of the workday. (R. 78-81).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could not perform Plaintiff's past relevant work, which the VE characterized as a composite job consisting of the positions of sandwich maker and bartender. (R. 81-82, 120-22). The ALJ also found, however, that Plaintiff had acquired "general bartending skills" that were transferrable to the position of bartender, a light job available in significant numbers in the national economy. (R. 82-83). As a result, the ALJ concluded that Plaintiff was not disabled at any time from the November 27, 2013 alleged disability onset date through the date of the decision. (R. 83). The Appeals Council denied Plaintiff's request for review on March 16, 2020. (R. 1-6). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that the ALJ (1) erred in finding that he had acquired transferrable skills from the composite sandwich maker/bartender job; (2) improperly concluded that he has the RFC for light work with frequent handling; and (3) made a flawed subjective symptom evaluation. For reasons discussed in this opinion, the Court finds that the ALJ did not commit reversible error and his decision is supported by substantial evidence.

## DISCUSSION

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019).  The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex*

4

*rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act. *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves considering whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). *See also Melvin J. v. Kijakazi*, No. 20 C 3284, 2022 WL 2952819, at *2 (N.D. Ill. July 26, 2022) (citing 20 C.F.R. § 416.920(a)). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Butler*, 4 F.4th at 501.

C.    **Analysis**

1.    **Transferrable Skills**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that he acquired transferrable skills from his past relevant work at the golf course snack shop. In describing that work, Plaintiff explained that customers would come up to a window and order food and drinks, which he would prepare. (R. 120-21). This consisted of making burgers and sandwiches and serving "a lot of alcohol and beer," including mixed drinks. (R. 121-22). The VE testified that this past work was a composite job consisting of an unskilled sandwich maker component (DOT 317.644-010) and a semi-skilled bartender component (DOT 312.474-010), both of which Plaintiff performed at the heavy exertional level. (R. 122, 123). Since the ALJ limited Plaintiff to light work, the VE agreed that Plaintiff is unable to perform this past relevant work. (R. 82, 124).

Under the Medical-Vocational Guidelines, a person of Plaintiff's advanced age and high school education who cannot perform his past relevant work is disabled unless he acquired skills that would transfer to other jobs available in significant numbers in the national economy. 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.06. The ALJ concluded that Plaintiff acquired "general bartending skills" that are transferrable to the position of bartender (DOT 312.474-010). (R. 82-83). Plaintiff objects that this determination runs afoul of SSR 82-41, which required the ALJ to identify the specific skills Plaintiff learned from the bartender component of his job and explain how they transfer to a bartender position. (Doc. 22, at 4-5; Doc. 31, at 4-6). *See Abbott v. Astrue*, 391 F. App'x 554, 558 (7th Cir. 2010) (SSR 82-41 "requires an ALJ 'to make certain findings of fact and include them in the written decision,' . . . includ[ing] 'the acquired work

6

skills' and the 'specific occupations to which the acquired work skills are transferable.'"). Plaintiff notes that the VE never testified that he "learned how to make all necessary drinks to bartend, knew the types of liquors stocked in a bar, or was familiar with basic food preparation and hygiene standards." (Doc. 22, at 5; Doc. 31, at 5). And Plaintiff claims he lacks several other bartender job skills such as ordering or requisitioning liquor and supplies, arranging bottles and glasses to make an attractive display, and slicing and pitting fruit for garnishing drinks. (Doc. 31, at 6).

This argument might be more persuasive if the ALJ had found that Plaintiff's bartending skills from his composite job transferred to a different occupation entirely. *See, e.g., Abbott*, 391 F. App'x at 558 (ALJ erred in failing to articulate how the skills the plaintiff acquired as a job coach transferred to the position of caseworker); *Key v. Sullivan*, 925 F.2d 1056, 1062-63 (7th Cir. 1991) (same error in finding skills from audit clerk and cashier jobs transferred to work as a billing clerk, billing machine operator, and payroll timekeeping clerk); *Smith v. Barnhart*, 388 F.3d 251, 252-53 (7th Cir. 2004) (same error in finding skills from tax preparer, program director, and management and information specialist jobs transferred to all other sedentary work); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1223 (9th Cir. 2009) (same error in finding skills from medical assistant and underwriter jobs transferred to work as a general clerk, file clerk, and sales clerk); *Dikeman v. Halter*, 245 F.3d 1182, 1184-88 (10th Cir. 2001) (same error in finding skills from checker jobs transferred to work as a cashier, a position ranging from unskilled to skilled in the DOT). But as noted, the VE testified based on Plaintiff's own description of his job duties that the bartender component of the composite job was classified as DOT 312.474-010, and that a person with Plaintiff's RFC could perform that same light level

job (bartender, DOT 312.474-010). (R. 120-23). In other words, unlike in the cases Plaintiff relies on, the ALJ found Plaintiff has skills from the composite portion of his bartender job that transferred to the exact same bartender job.

In such circumstances, even if the ALJ should have better articulated his reasoning as to Plaintiff's transferrable skills, the error is harmless and does not support remanding the case.[2] *Butler*, 4 F.4th at 504 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)) ("[T]he harmless error standard applies to judicial review of administrative decisions, and 'we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.'"). Plaintiff's request to remand the case for further consideration of this issue is denied.

## 2. RFC

Plaintiff argues the case still requires reversal or remand because the ALJ erred in finding he has the RFC for light work with frequent handling (meaning 34-66% of the workday). A claimant's RFC is the maximum work that he can perform despite any limitations. 20 C.F.R. § 416.945(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also* 20 C.F.R. § 416.927(f)(2).

---

[2] The Court notes that Plaintiff spent five years working as a full-time bartender at a bar from February 2000 to February 2005. (R. 261). He also reported his occupation as "bartender" during a July 2018 Internal Medicine Examination. (R. 524).

### a. Light Work

Looking first to the RFC for light work, the ALJ acknowledged Plaintiff's history of degenerative changes in the cervical spine, his syndesmotic ankle injury requiring open reduction and internal fixation surgery, and his obesity, but also noted that physical exams routinely showed full range of motion, full strength, and normal gait. (R. 79). The record reflects that Plaintiff had a series of imaging studies of his knees, ankles, and cervical spine in 2014. The February 2014 knee x-rays showed very early tibial spine spurring on the right and suggestion of a very tiny sessile osteochondroma within the left proximal fibular diaphysis. (R. 365). Ankle x-rays taken the same month showed status post open reduction internal fixation on the left with some lucency about the screws suggesting loosening and/or infection. (R. 79, 365). Finally, an April 2014 MRI of the cervical spine showed degenerative findings with central canal and foraminal stenosis especially just above and below the C5-C6 level. (*Id.*).

There is no evidence that Plaintiff sought further treatment for spine, ankle, or knee problems for over a year until July 28, 2015. (R. 363). It appears he saw rheumatologist Justin Gan, M.D., that day but there is no corresponding treatment note in the record. (*Id.*). During a follow-up with Dr. Gan nine months later on April 27, 2016, Plaintiff exhibited: no swelling or tenderness and full range of motion in his elbows; no tenderness and nearly full range of motion in his shoulders; no tenderness and full range of motion in his hips; no effusion and full nonpainful range of motion in the right knee; no synovitis and full nonpainful range of motion in the left knee; no synovitis or tenderness and full range of motion in the ankles; full motor strength of 5/5 in all extremities; and intact sensation despite some lumbar paraspinal tenderness. (R. 364). Dr. Gan assessed improved

polyarthritis likely related to hepatitis C, and history of ankle surgery with no current symptoms. (R. 366).

Plaintiff did not return to Dr. Gan again for more than a year until May 16, 2017. At that visit, Plaintiff once again presented with: no swelling or tenderness and full range of motion in his elbows; no tenderness and nearly full range of motion in his shoulders; no tenderness and full range of motion in his hips; no effusion and full nonpainful range of motion in the right knee; no synovitis or tenderness and full nonpainful range of motion in the left knee; no synovitis or tenderness and full range of motion in the ankles; full motor strength of 5/5 in all extremities; and intact sensation despite some lumbar paraspinal tenderness. (R. 439). The assessment remained improved polyarthritis. (R. 441). Subsequent exams with Dr. Gan on July 11, 2017, July 25, 2017, and October 4, 2017, produced the same largely normal results. (R. 539, 549, 561). Nevertheless, Dr. Gan completed a Physical RFC Questionnaire on October 4, 2017 opining that Plaintiff: can only walk one block without rest or severe pain; can sit for 30 minutes at a time before needing to get up; can stand for 5 minutes before needing to sit down or walk around; can sit for about 2 hours and stand/walk for less than 2 hours in an 8-hour workday; must get up and walk every 30 minutes for 4 minutes and needs to switch positions at will; can rarely lift less than 10 pounds and never lift any other weight; will sometimes need to take unscheduled breaks for 30-45 minutes at least every hour due to joint pain, swelling, and muscular aches; and would likely be absent from work more than 4 days per month. (R. 633-35).

During a follow-up exam with Dr. Gan on May 30, 2018, Plaintiff continued to exhibit full strength of 5/5 in all extremities and intact sensation. (R. 644). There was

some paraspinal and scapula tenderness in his back, but all other findings were normal: no swelling or tenderness in the elbows with full range of motion; no tenderness and nearly full range of motion in the shoulders; no tenderness and full range of motion in the hips; no synovitis or tenderness in the ankles with full range of motion; and full nonpainful range of motion in both knees with only mild tenderness on the left. (R. 645). Exams performed on July 3 and July 31, 2018 produced identical results. (R. 671, 685). The only documented change on September 11, 2018 was a positive Spurling test on the left side of the neck. (R. 715-16). A CT scan of the cervical spine taken that day showed cervical spondylosis at C5-C6, moderate disc height loss at C6-C7, multilevel facet property, and suggestion of moderate or high-grade neural foraminal narrowing at a few levels. (R. 708-09). An MRI performed on September 28, 2018 documented left posterolateral disc protrusion with progression of bony spurring leading to left foraminal stenosis but no other measurable degenerative changes. (R. 709-10).

On October 16, 2018, internist Jason T. Garti, M.D., diagnosed Plaintiff with cervical radiculopathy and arthritis, but a physical exam that day was largely normal: no complaints regarding the muscles, bones, or joints; supple neck with no tenderness; no swelling in any extremities; normal gait; symmetric reflexes; intact sensation; and full muscle strength of 5/5 throughout. (R. 730). When Plaintiff returned to Dr. Gan on October 24, 2018, he once again exhibited no problems with his elbows, shoulders, hips, knees, and ankles, but he continued to have tenderness in the back and a positive Spurling test on the left side of his neck. (R. 737-38). Dr. Gan referred Plaintiff for a possible neck injection. (R. 744).

A little more than a week later, on October 25, 2018, Plaintiff saw Matthew A. Co, D.O., for evaluation of his neck pain. Dr. Co observed decreased range of motion in Plaintiff's neck, tenderness to palpation along the left lower cervical paraspinals, and positive Spurling test on the left. (R. 752). Dr. Co recommended an epidural steroid injection. (R. 753). Before that could occur, however, Plaintiff was admitted to the hospital on November 6, 2018 with acute mid-thoracic back pain. (R. 791). He then developed acute hypoxic respiratory failure secondary to suspected viral pneumonitis and cardiac complications. (*Id.*). After spending approximately 20 days in the hospital, Plaintiff had some neural irritation of the lumbar spine with some reduced reflexes, but his rehabilitation potential was described as excellent. (R. 79, 999-1000). There are no further treatment notes in the record.

In concluding that these records demonstrate an RFC for light work, the ALJ properly considered all of the opinions of record. Since Plaintiff filed his claim in May 2017, the treating source rule used for claims filed before March 27, 2017 does not apply. This means the ALJ was not required to "defer or give any specific evidentiary weight" to any medical opinion, including a treating physician's opinion. 20 C.F.R. § 404.1520c(a). *See also* Social Security Administration, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819 (Jan. 18, 2017). Instead, the ALJ was required to "evaluate the persuasiveness of each medical opinion based on certain factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; and (5) other factors, including the source's familiarity with other evidence in the claim or an understanding of Social Security disability policies and requirements." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022)

(citing 20 C.F.R. § 404.1520c(c)(1)-(5)). An ALJ must explain how he considered the first two factors (supportability and consistency) and may but is not required to explain his consideration of the other factors. 20 C.F.R. § 404.1520c(b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion." *Michelle D.*, 2022 WL 972280, at *4 (citing 20 C.F.R. § 404.1520c(c)(1)). "Consistency assesses how a medical opinion squares with other evidence in the record." *Id.* (citing 20 C.F.R. § 404.1520c(c)(2)).

Consultative reviewer Richard Bilinsky, M.D. determined on August 21, 2017 that Plaintiff can perform medium work with frequent kneeling, crouching, and crawling, but unlimited balancing and climbing of ramps, stairs, ladders, ropes, and scaffolds. (R. 135-36). On January 5, 2018, Lenore Gonzalez, M.D., affirmed the RFC for medium work but added some additional restrictions: frequent climbing of ramps and stairs; and occasional climbing of ladders, ropes, and scaffolds. (R. 147-48). The ALJ found both opinions unpersuasive, explaining that symptom exacerbations and complaints of back pain supported a restriction to a reduced range of light work. (R. 80-81). The ALJ also rejected Dr. Gan's October 2017 opinion that Plaintiff can barely sit, stand, or walk and can rarely lift even 10 pounds, finding it inconsistent with the doctor's own treatment notes and other evidence routinely showing Plaintiff had a normal gait, full strength of 5/5 in all extremities, and minimal problems with his elbows, shoulders, hips, knees, and ankles. (R. 81). Instead, the ALJ accepted a July 29, 2018 Internal Medicine Examination performed by Julia Kogan, M.D., reflecting that Plaintiff has full range of motion in the cervical spine, shoulders, hips, knees, elbows, and lumbar spine, as well as normal gait, full strength, no paraspinal muscle spasm or atrophy, negative straight leg raise bilaterally, and full range

of motion in the extremities.  (R. 525-29).  Notwithstanding these normal findings, the ALJ imposed greater restrictions to account for recurrent symptom exacerbation and Plaintiff's complaints of pain.  (R. 81).

Plaintiff does not challenge the ALJ's assessment of the opinion evidence or explain how any of the cited medical records support a limitation to sedentary work. Rather, Plaintiff objects to the ALJ's determination that he can perform light work "as defined in 20 CFR 416.967(b)" (R. 78), without specifically identifying the amount of lifting, carrying, standing, sitting, and walking that he can do.  (Doc. 22, at 11; Doc. 31, at 9-10). In Plaintiff's view, this constitutes reversible error because the Regulations contemplate different variations of light work, with some jobs requiring more standing and others requiring more sitting, and it is not clear which category of positions he can perform.  (Doc. 22, at 11-12; Doc. 31, at 9-10).  This argument is not persuasive.

The Regulations define "light work" as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and a "good deal" of walking or standing.  20 C.F.R. § 416.967(b).  SSR 83-10 further clarifies that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday."  SSR 83-10, at 6.  The ALJ asked the VE about a hypothetical person who can sit, stand, and walk for about 6 hours in an 8-hour workday.  The VE testified that such a person could work as a bartender.  (R. 125-26). *See Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) ("Both light work and medium work require[s] standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday.") (internal quotations omitted).  Though the ALJ did not ask about a person who can frequently lift and carry 10 pounds and never lift more than 20

14

pounds at a time, the VE testified that the bartender job constitutes light work and so it must fall within those parameters.  (R. 123).

There is likewise no merit to Plaintiff's argument (abandoned in the reply brief) that the ALJ failed to consider his impairments in combination and in light of his obesity.  (Doc. 22, at 13).  The ALJ acknowledged that Plaintiff's obesity likely contributes to or exacerbates his other impairments, and stated that he considered all of Plaintiff's degenerative, musculoskeletal, and cardiovascular conditions in determining the RFC. (R. 79, 80).  Notably, no physician of record documented any functional limitations, or imposed any restrictions related to Plaintiff's obesity, and as discussed, physical examinations of his elbows, shoulders, hips, knees, and ankles were routinely normal, as was his gait, motor strength, and sensation.  Plaintiff does not explain how these normal exams demonstrate that his obesity, in combination with other impairments, renders him disabled.  *See Lynda W. v. Saul*, No. 19 C 2021, 2020 WL 2542156, at *4 (N.D. Ill. May 19, 2020) (quoting *Shumaker v Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015)) (ALJ properly considered the plaintiff's obesity where the plaintiff "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments.").

Viewing the record as a whole, the ALJ's conclusion that Plaintiff has an RFC for light work is supported by substantial evidence.  *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154) ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"").  Plaintiff's request to reverse the case for further consideration of this issue is denied.

### b.     Frequent Handling

Turning to the RFC for frequent handling, the record reflects that Plaintiff has a history of hand, wrist, and finger problems dating back to February 2014 when a hand x-ray showed bilateral arthritis predominantly involving the first carpometacarpal ("CMC") joint where the base of the thumb meets the hand, greater on the left than the right, and also involving the triscaphe joint in the thumb and the distal interphalangeal joint.  (R. 365).  An EMG/NCV performed in April 2014 was a borderline study showing bilateral median neuropathy at the wrists indicative of carpal tunnel syndrome, and was moderately severe on the left and mild on the right.  (R. 79, 365).  Repeat x-rays on May 29, 2015 showed osteoarthritis in both hands, left greater than right.  (R. 79, 366).  The x-ray of the right hand showed mild radiocarpal, triscaphe, and first metacarpophalangeal ("MCP") joint osteoarthritis, but severe 1st CMC joint osteoarthritis with joint space narrowing and osteophyte formation, producing a bone-on-bone occurrence at the 1st CMC joint.  (R. 392).  The x-ray of the left hand showed mild radiocarpal and triscaphe joint osteoarthritis, moderate 1st MCP joint osteoarthritis, and severe 1st CMC joint osteoarthritis with joint space narrowing and osteophyte formation, producing a bone-on-bone appearance at the 1st CMC joint.  (R. 393).

Plaintiff saw his rheumatologist Dr. Gan in June 2015 and received 1st CMC joint injections which did not help.  (R. 363).  It appears that Plaintiff returned to Dr. Gan on July 28, 2015 but the treatment note for that visit is not in the record.  (*Id.*).  The next follow-up appointment with Dr. Gan was nine months later on April 27, 2016, when Plaintiff

16

complained that he experienced bilateral thumb pain with intermittent swelling and pain at the base of the left thumb. He also stated that his right thumb sometimes "popped out" at night causing severe pain at a level of 8/10, and that using his thumbs/hands during the day likewise resulted in severe pain. (*Id.*). An examination of Plaintiff's hands showed bilateral positive tender trigger finger nodule at the 1st MCP joint; swelling and tenderness at the 1st CMC joint; painful range of motion on the right; and nonpainful range of motion on the left. (R. 364). Dr. Gan assessed bilateral osteoarthritis of the 1st CMC and administered Depo-Medrol injections to help with bilateral thumb trigger fingers. (R. 366-67). Plaintiff's hand numbness, likely due to carpal tunnel syndrome, was stable. Dr. Gan instructed Plaintiff to take diclofenac twice daily, try occupational therapy ("OT") if he did not experience improvement, and return in three weeks. (R. 367).

Plaintiff had several OT sessions but by June 24, 2016 he still had significant pain and right thumb trigger finger symptoms. (R. 79, 395). Robert RL Gray, M.D., an orthopedic hand surgeon, ordered x-rays that showed significant degenerative joint disease at the CMC joints. (R. 396, 454-55). Plaintiff opted for surgical intervention and on July 1, 2016, Dr. Gray performed a right thumb arthroplasty, trapeziectomy, flexor carpi radialis ("FCR") to abductor pollicis longus ("APL") tendon transfer, and right thumb trigger finger release. (R. 79, 380). At a follow-up appointment on August 5, 2016, Plaintiff's pain was controlled (0/10) and he reported no numbness, tingling, or other systemic complaints following surgery. Dr. Gan referred Plaintiff for OT and by the time of his discharge on August 24, 2016, his pain remained 0/10 and he was able to complete all tasks without pain or difficulty. (R. 79, 416, 498).

17

Approximately nine months later, on May 16, 2017, Plaintiff returned to Dr. Gan complaining that using his hands/thumbs during the day caused severe pain, which he described as achy and sharp at a level of 9/10. Aleve only helped somewhat and Plaintiff requested another thumb injection. (R. 437). On exam, Plaintiff's left hand showed no swelling at the 1st MCP joint but mild swelling and tenderness at the 2nd and 3rd MCP; swelling and tenderness at the 1st CMC; and painful range of motion. (R. 439). An exam of the right hand showed no swelling at the 1st MCP but tender trigger finger nodule; no swelling or tenderness in the 1st CMC; and nonpainful range of motion. (*Id.*). Dr. Gan performed a left thumb 1st CMC arthrocentesis, administered a left 1st CMC injection, and instructed Plaintiff to restart diclofenac twice daily. (R. 79, 441, 516). When Plaintiff returned to Dr. Gan on July 11, 2017, he reported that the injection had helped for four weeks, after which the pain worsened again. An exam revealed the same level of swelling, pain, and tenderness exhibited at the May 2017 visit. (R. 539). Dr. Gan told Plaintiff to stop taking diclofenac and start a course of prednisone. (R. 542).

On July 25, 2017, Plaintiff told Dr. Gan the prednisone had helped with the thumb swelling and pain, but his wrists were sore and he experienced intermittent hand numbness and tingling with occasional difficulty holding objects despite no overt weakness. (R. 547). A physical exam was largely unchanged from July 11, 2017 and Dr. Gan instructed Plaintiff to finish the course of prednisone, start Cymbalta, and take Aleve or diclofenac twice daily as needed for breakthrough pain. (R. 549, 551). At a follow-up appointment on October 4, 2017, Plaintiff's pain was less intense but still present and he reported having good days and bad days. (R. 559). An exam showed swelling and tenderness at the 1st CMC on the left hand with painful range of motion, and

tenderness in the wrists, though Plaintiff had full nonpainful range of motion in the right hand with no swelling or tenderness. (R. 79, 561). Dr. Gan advised continued use of Cymbalta. (R. 563). The same day, Dr. Gan completed the Physical RFC Questionnaire indicating that Plaintiff has severe limitations due to his joint pain and swelling that prevent him from grasping and performing fine manipulations with both hands for more than 5% of the workday, or reaching with his arms for more than 50% of the workday. (R. 634).

Approximately seven months later, on May 30, 2018, Plaintiff saw Dr. Gan and complained of worsening pain and burning sensation in his fingers, as well as nighttime pain in his thumbs. (R. 642-43). But his physical exam remained unchanged from October 2017. (R. 645). Dr. Gan prescribed another 5-day course of prednisone and added methotrexate to Plaintiff's medication regimen. (R. 79, 642, 645, 647). Exams on July 3, 2018, July 31, 2018, September 11, 2018, and October 24, 2018 produced similar results, including swelling and tenderness in the left 1st CMC and painful range of motion but no problems with the right hand aside from some tenderness in the 1st CMC. (R. 671, 685, 715, 737).

The ALJ discussed these medical findings and determined they support a limitation to frequent bilateral handling. In reaching this conclusion, the ALJ once again considered all of the opinion evidence of record. Dr. Bilinsky determined on August 21, 2017 that Plaintiff has no manipulative limitations whatsoever (R. 136), and Dr. Gonzalez affirmed that assessment on January 5, 2018. (R. 148). The ALJ found both of these opinions unpersuasive given evidence that Plaintiff "experienced some symptom exacerbations with swelling and recurrent pain" which supported "some manipulative limitations." (R. 80-81). Plaintiff does not challenge this aspect of the ALJ's decision. Nor does Plaintiff

argue that the ALJ erred in rejecting Dr. Gan's October 4, 2017 opinion that Plaintiff essentially can never use his hands at all. (R. 634). Indeed, an exam performed on the day of that opinion revealed Plaintiff had full nonpainful range of motion and strength in his right hand, full nonpainful range of motion in both wrists, and full strength in the left hand despite some swelling, tenderness, and painful range of motion. (R. 560-61). The ALJ reasonably concluded that this evidence conflicted with Dr. Gan's assessment that Plaintiff can use both of his hands for no more than 5% of the workday. (R. 81). *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) (an ALJ may decline to credit a treating physician's opinion "when the opinion is inconsistent with the physician's treatment notes."); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021) ("[T]he ALJ was correct to afford little weight to [treating opinion] evidence because many of the statements included in the letter . . . were contradicted by [the doctor's] own treatment notes.").

Plaintiff objects that once the ALJ discounted the opinions from Dr. Gan and the state agency reviewers, there remained no evidentiary basis to support an RFC for frequent handling. (Doc. 22, at 9, 11). To the contrary, on July 29, 2018, Dr. Kogan examined Plaintiff and documented: no redness, warmth or joint effusion in the hands; normal range of motion; full grip strength of 5/5; and no difficulty using either hand to open a door with a doorknob, squeeze a blood pressure cuff, pick up a coin or pen, button/unbutton, and zip/unzip. (R. 529). The ALJ found this opinion persuasive, noting its consistency with medical records showing that from May 16, 2017 through October 25, 2018, Plaintiff had some tenderness and painful range of motion in the left hand, but no swelling in the right hand, full nonpainful range of motion of the right hand and both wrists, intact sensation, full motor strength of 5/5 throughout, normal neurological findings, and

full range of motion in the extremities. (R. 81, 439, 539, 548, 561, 611-12, 644-45, 658, 700, 730, 752).

Though Dr. Kogan did not identify any deficits in Plaintiff's manipulative functioning, the ALJ nonetheless restricted him to frequent as opposed to constant handling in recognition of Plaintiff's testimony that he experiences symptom exacerbations and pain. (R. 81). *See McReynolds v. Berryhill*, 341 F. Supp. 3d 869, 881 (N.D. Ill. 2018) (finding no "evidentiary deficit" where the ALJ partially relied on state agency opinion but also incorporated additional limitations). Plaintiff stresses that Dr. Kogan did not expressly opine that he can frequently use his hands to handle, or state that he can carry larger objects such as boxes of wine and kegs of beer. (Doc. 22, at 9-10; Doc. 31, at 8 n.6). Regardless, the normal findings in Plaintiff's hands, wrists, shoulders, neck, elbows, and wrists support an RFC for frequent handling, including such larger objects. (R. 525-30). Plaintiff may believe that this same evidence indicates he is limited to occasional handling (Doc. 22, at 9, 10; Doc. 31, at 7-8), but "[w]e do not reweigh the evidence or substitute our own judgment for that of the ALJ." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). "Rather, it is the role of the ALJ to resolve conflicts in the evidence and to formulate an appropriate RFC based on consideration of the entire record." *McReynolds*, 341 F. Supp. 3d at 880. The ALJ did so here.

Viewing the record as a whole, the ALJ built a logical bridge between the medical evidence and his conclusion that Plaintiff can engage in frequent handling. Since that decision is supported by substantial evidence, Plaintiff's request to remand the case for further consideration of the issue is denied. *Biestek*, 139 S. Ct. at 1154.

### C.    Subjective Statements

Plaintiff finally argues that the ALJ erred in assessing his subjective statements regarding his symptoms.  In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including:   the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017).  "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)).  "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong."  *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."  *Grotts*, 27 F.4th at 1278.

Plaintiff first contends that the ALJ applied the wrong legal standard in evaluating his symptoms.  Specifically, the ALJ began by reciting the following language: Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for

the reasons explained in this decision." (R. 80). Plaintiff insists that the phrase "not entirely consistent" is meaningless boilerplate and even indicates that the ALJ placed a higher evidentiary burden on him than the law allows. (Doc. 22, at 14-15; Doc. 31, at 10-11). This Court disagrees. The Seventh Circuit has made clear that "[t]he fact that the ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). As discussed below, the ALJ provided several valid reasons for rejecting Plaintiff's statements.

In addition, the ALJ's decision contains language demonstrating his use of the correct preponderance standard. For example, he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p." (R. 78). This court follows the majority of courts in this district that "have repeatedly rejected the argument that th[e] boilerplate language changes the claimant's evidentiary burden." *Nina Joyce H. v. Saul*, No. 18 C 4913, 2020 WL 212771, at *8 (N.D. Ill. Jan. 14, 2020); *Aitmus R. v. Saul*, No. 18 C 5735, 2019 WL 4923208, at *7 n.13 (N.D. Ill. Oct. 4, 2019) (collecting cases).

Turning to the substantive analysis, the ALJ first discounted Plaintiff's statements because they were inconsistent with objective evidence in the record showing that he had full strength, normal nonpainful range of motion in various joints, and normal gait. (R. 80). The Court finds no error in this determination. *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007))

("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record."). The ALJ next acknowledged Plaintiff's testimony that his hands frequently swell up causing significant functional limitations that prevent him from gripping and writing, and agreed the record contains evidence of recurrent symptom exacerbation and reports of pain. (R. 78, 81). But the ALJ also noted that Plaintiff is independent in matters of self-care, including bathing, toileting, feeding, and dressing. (R. 78, 80) (citing R. 524). In addition, Plaintiff indicated that he can clean and do laundry despite needing help folding clothes sometimes, and he shops for groceries and can walk a mile without resting. (R. 293-95, 297). The Seventh Circuit recently affirmed that "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022). Since the ALJ did not improperly equate Plaintiff's activities with an ability to work, this aspect of the credibility determination is not patently wrong.

The ALJ finally considered Plaintiff's course of treatment, noting that he exhibited "improved functioning with treatment, including occupational therapy, the use of splints, medication, and steroid injections." (R. 80). Plaintiff argues that the ALJ needed to say more, but an ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). Here, the ALJ provided enough valid reasons for discounting Plaintiff's complaints of disabling symptoms and that decision is supported by substantial evidence. *Biestek*, 139 S. Ct. at 1154.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and Defendant's Motion for Summary Judgment [27] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: November 21, 2022

_____
SHEILA FINNEGAN
United States Magistrate Judge